UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

ANNETTE SIMS,                          )
                                       )
    Plaintiff,                         )
                                       )
vs.                                    )   Case No.  4:20-cv-01183-HNJ
                                       )
COMMISSIONER, SOCIAL                   )
SECURITY ADMINISTRATION,               )
                                       )
    Defendant.                         )

## MEMORANDUM OPINION

Plaintiff Annette Sims seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding her claim for a period of disability and disability insurance. (Doc. 1). The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 13).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge ("ALJ"), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997))).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* §§ 404.1520(a)(4)(v); *see also* 20

C.F.R. §§ 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Sims, age 50 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance on September 8, 2017, alleging disability beginning May 29, 2013. (Tr. 155–65). The Commissioner denied Sims's claims, and

Sims timely filed a request for a hearing on February 20, 2018. (Tr. 85–91). The ALJ held a hearing on August 27, 2019, (tr. 10), and issued an opinion on November 29, 2019, denying Sims's claims. (Tr. 7–16).

Applying the five-step sequential process, the ALJ found at step one that Sims did not engage in substantial gainful activity after May 29, 2013, her alleged disability onset date, to December 31, 2018, her date last insured. (Tr. 12). At step two, the ALJ found Sims exhibited the severe impairment of degenerative disc disease. (Tr. 12). At step three, the ALJ found that Sims's impairment did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12–13).

> Next, the ALJ found that Sims exhibited the RFC
>
> to perform light work as defined in 20 CFR 404.1567(b) except [he limited her to] occasionally climbing ramps or stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling, crouching or crawling, no overhead reaching bilaterally, . . . avoid[ing] all exposure to unprotected heights, unprotected moving mechanical parts and dangerous machinery.

(Tr. 13).

At step four, the ALJ determined Sims could not perform her past relevant work as a hair stylist. (Tr. 14–15). However, at step five, the ALJ determined Sims could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC. (Tr. 15–16). Accordingly, the ALJ determined that Sims has not suffered a disability, as defined by the Social Security Act, during the period May 29, 2013, to December 31, 2018. (Tr. 16).

Sims timely requested review of the ALJ's decision. (Tr. 152–54). On June 17, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1–4). On August 14, 2020, Sims filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

Sims's appeal challenges the ALJ's consideration whether her pain establishes she is disabled. Initially, Sims asserts "the ALJ's decision does not discuss or refer to the Eleventh Circuit's pain standard." (Doc. 19 at 13). The court disagrees.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. [*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from the condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021) (per curiam). The ALJ applied an equivalent standard:

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms

6

are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(Tr. 13). Thus, the ALJ set forth the applicable pain standard.

Sims then contends the ALJ's decision does not rest upon substantial evidence because the ALJ improperly discredited her subjective complaints of pain and, in turn, misapplied the pain standard. A claimant's testimony coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons

for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304, at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Sims testified that her back and neck injuries originate from a motor vehicle accident in 2013. (Tr. 35). In October 2015, Sims underwent back surgery. (*Id.*). After her back surgery, Sims began experiencing neck pain that limited her ability to hold her head up. (Tr. 40–41). Sims's physician diagnosed her with bone spurs. (*Id.*). Sims underwent neck surgery in October 2017. (Tr. 36). At some point before her accident, Sims underwent carpal tunnel surgery on her right hand as well, although she mainly uses her left hand. (Tr. 30, 36).

After Sim's back surgery, she received a prescribed back brace which she mainly wears outside of her house. (Tr. 54–55, 61). The brace provides her some relief. (Tr. 54, 61). Sims also underwent physical therapy. (Tr. 36–37). In addition to the brace and physical therapy, Sims's physician prescribed her pain medication every month, and then placed her into pain management. (Tr. 40).

Currently, Sims still attends pain management every month and takes Percocet and Tizanidine. (Tr. 37, 39). She takes her pain medication three times per day. (*Id.*). Sims does not receive any kind of "spinal blocks" or steroid injections for treatment. (Tr. 37). Sims's physicians also have not recommended any additional physical therapy

8

or surgery. (*Id.*). Sims claimed her medication "mostly" helps her pain but never neutralizes it. (Tr. 38–39). Sims rated her pain "around an 8" and stated her medication lowers it to a 4 or 5. (Tr. 38). She additionally experiences back stiffness, hand cramps, and leg numbness occasionally. (Tr. 39, 42, 54). At the time of the hearing, Sims had no recent emergency room visits or hospitalizations. (Tr. 39).

Sims declared she can stand for 15-20 minutes before she experiences sharp pains up her back. (Tr. 38). She then must sit down for 30-45 minutes before she can stand up again. (*Id.*). Sims averred the chair she sat on during the hearing gave her back and tailbone issues. (Tr. 53). In addition, after 30 minutes of testifying while sitting down, her back pain increased "a little bit." (*Id.*). Sims also explained that on her hour-long commute to the hearing, she needed to stop and walk around. (Tr. 53–54). Sims only drives when necessary. (Tr. 31). She discussed how she went to church in the last few weeks after a considerable period, but she has not returned because she has trouble sitting through the service, which usually lasts about an hour. (Tr. 47, 56). In addition, Sims can walk about "half a block" without needing rest. (Tr. 41–42, 52–53).

Sims's other abilities include the capacity to lift and carry a gallon of milk, extend her arms above her head "a little bit," and pick up small items. (Tr. 42). Sims explained she could bend over to pick up a box of tissue but not to put her shoes on. (Tr. 43). Rather, she lifts her leg up, crosses it over the other, and slides her shoe onto her foot. (*Id.*). Depending on what she wears, her husband assists her with dressing. (*Id.*). Sims's husband also prepares all the meals, sweeps, mops, vacuums, and does the outside

chores. (Tr. 44, 59). Sims stated that when she goes grocery shopping with her husband, she cannot walk very far. (Tr. 44). Thus, Sims sometimes chooses to either stay home or sit in the car while her husband shops. (*Id.*). Sims stated she uses the restroom on her own, now it just takes her longer than it used to. (Tr. 43–44). It also takes her all day to wash dishes because she can only stand up for a few minutes. (Tr. 44). Sims cannot put laundry in or out of the dryer either. (Tr. 55). She does, however, sit and fold laundry in her lap. (Tr. 44, 55).

In her Function Report, Sims stated she cares for her dogs by letting them in and out of the house. (Tr. 192). Sims's husband also contributes to caring for the dogs. (*Id.*). Sims discussed she cannot sleep in one position for very long because her pain wakes her up throughout the night. (*Id.*). Sims's injuries also cause her to take longer getting dressed, which requires the assistance of her husband sometimes. (*Id.*). However, she proceeds well with washing and brushing her hair, and she has no issues shaving her legs, which she does once or twice a week. (*Id.*).

Sims testified she prepares sandwiches and microwaves frozen dinners daily. (Tr. 193). She cannot stand long enough to prepare other meals without experiencing pain. (*Id.*). Sims no longer does yard work either, but she performs light housework such as folding laundry and washing dishes. (*Id.*). Sims explained it takes longer than expected to complete her chores because she needs to rest while doing them. (*Id.*). Sims explained she partakes in activities that involve sitting, but she can only do so in short intervals. (Tr. 195). Sims no longer plays sports or participates in physical activities

though. (*Id.*). She listed that her injuries limit her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Tr. 196). Sims further discussed she can walk for 2-5 minutes before needing rest. (*Id.*). She then needs ten minutes of rest before she can resume walking. (*Id.*).

The ALJ found that Sims's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but he concluded Sims's "statements concerning the intensity, persistence, and limiting effects" of her impairments were not consistent with the objective medical evidence in the record. (Tr. 13–14). The court finds that the ALJ adequately articulated the reasons for his findings.

The ALJ explained:

> The claimant was in a motor vehicle accident in May 2013. (7F3). She subsequently took Percocet for her back and neck pain symptoms. (3F4, 10; 7F3). She underwent a total laminectomy fusion and bilateral fascetemomy [sic] at the L5 disc section and a fusion in 2015. (7F3, 6). She underwent a discectomy in 2017 of her Cervical Spine. (5F14). Treatment notes indicate that she healed well and imaging looked good after surgery. (2F9; 4F3). However, she has been noted as presenting without clubbing, cyanosis, or edema and instead demonstrating normal ROM and strength in her musculoskeletal system. (7F7, 9). She has sometimes denied experiencing pain in her neck. (6F5). She has been noted as demonstrating a normal ROM in her back sometimes. (5F22). A study of her lower extremities showed no evidence of peripheral neuropathy. (6F43).
>
> . . .
>
> I find the assessment of the claimant provided by Doctor Victoria Hogan, MD, persuasive. (3A). They opined that she would be limited to a Light Exertional Level with limitations in reaching, climbing, balancing, kneeling, and crawling. This is supported by cited findings of back and neck pain versus no edema and is consistent with the evidence of the longitudinal record including treatment provider findings of full ROM and normal strength.

(Tr. 14).[2]

Substantial medical evidence in the record supports the ALJ's findings. In May 2013, immediately after Sims's motor vehicle accident, Dekalb Regional Medical Center reported she exhibited mild tenderness in her neck, lumbar, and shoulder. (Tr. 237–38). Sims did not, however, display any focal deficits. (Tr. 238). Sims then underwent a CT scan of her cervical spine. (Tr. 243). The scan exhibited a "[s]traightened cervical spine which may be related to positioning versus spasm," but "[o]therwise [portrayed] unremarkable" findings. (*Id.*). The Medical Center also performed a CT scan on Sims's lumbar spine. (Tr. 248). At first, the Medical Center stated Sims exhibited "[n]ondisplaced fractures of the lumbar spine right transverse processes at L2, L3, and L4." (*Id.*). However, the CT scan "was re-presented for dictation on 07/10/2013," and the Medical Center stated "[t]he transverse process fractures of the right 2nd, 3rd, and 4th levels noted on the CT examination are not well visualized in this exam." (Tr. 245). The Medical Center concluded the CT scan contained "[n]o significant findings

---

[2] The ALJ did not explicitly reference Sims's Function Report in his opinion. Nonetheless, the ALJ's opinion states he "considered all [of Sims's] symptoms" based upon 20 C.F.R. 404.1529 and SSR 16-3p. (Tr. 13). In addition, "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is not enough to enable a reviewing court to conclude the ALJ considered the claimant's medical condition as a whole." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal alterations and citation omitted). For the reasons discussed herein, the ALJ's opinion reasonably portrays he considered Sims's condition as a whole. Accordingly, any error arising from the ALJ's failure to summarize Sims's Function Report manifests harmlessly, particularly as Sims does not raise any issue in this regard. *See Nance-Goble v. Saul*, No. 4:20-cv-00369-CLM, 2021 WL 2401178, at *3–5 (N.D. Ala. June 11, 2021) (finding the ALJ did not specifically mention the claimant's relevant hearing testimony but stated he considered "all [her] symptoms" based upon § 404.1529, and thus, did not improperly omit reference to the claimant's testimony).

of acute traumatic injury." (*Id.*).  Sims received prescriptions for Lortab and Flexeril during her visit.  (Tr. 239).

In June 2013, Sims attended her initial appointment with James G. White, III, M.D.  (Tr. 277).  Sims reported suffering chronic back pain since her involvement in a motor vehicle accident.  (*Id.*).  She stated pain medication and muscle relaxers helped somewhat.  (*Id.*).  Dr. White found no overt sensory or motor deficits that he could ascertain.  (*Id.*).  Sims did however exhibit "some paralumbar tenderness and tenderness in the lower thoracic area."  (*Id.*).  He submitted an order for Sims to undergo a thoracic and lumbar MRI scan.  (Tr. 278).  Dr. White also held Sims out of work until she felt able to return.  (*Id.*).

In July 2013, Dr. White found Sims exhibited a herniated thoracic and lumbar disc.  (Tr. 275).  He noted "[Sims] ha[d] not been treated conservatively since her car accident."  (*Id.*).  In August 2013, Dr. White stated Sims had a degenerated herniated disc at L5 with a T7 small disc protrusion.  (Tr. 274).  He prescribed Sims Ultram.  (*Id.*).  In September 2013, Dr. White noted Sims did not need surgical intervention.  (Tr. 273).  Furthermore, he released Sims to return to work as needed.  (*Id.*).

On February 2015, Sims visited Luz Crystal, M.D., for a wellness and six month check up.  (Tr. 303).  Dr. Crystal stated Sims had been doing well, except she continued to experience lower back pain from the motor vehicle accident.  (*Id.*).

On April 8, 2015, Sims returned to Dr. White, stating the pain in her right hip and leg had worsened.  (Tr. 271).  During a physical examination, Sims exhibited a

positive straight leg raising test on the right at 30 degrees and diminished ankle jerks bilaterally with no focal deficits. (*Id.*). Sims also walked with a limp and portrayed a limitation with forward bending at 30 degrees with a bilateral paralumbar spasm. (*Id.*). Dr. White scheduled Sims to undergo another lumbar MRI scan because he believed surgical intervention may have been needed. (Tr. 272). On April 22, 2015, Dr. White opined Sims suffered a degenerative L5 disc with mild posterior bulging. (Tr. 270, 295). He further commented that her conditioned continued to deteriorate and no emergency existed, but if Sims could not tolerate her pain, she could be eligible for a one lever lumbar interbody infusion. (*Id.*).

On June 8, 2015, Sims produced the same results during her physical examination as she did on April 8, 2015. (Tr. 268). Dr. White scheduled her for a one level lumbar interbody fusion. (*Id.*). On June 11, 2015, Sims underwent surgery for her herniated degenerative L5 disc. (Tr. 300, 389). After the surgery, an x-ray exhibited a successful pedicular screw placement and fusion at L5. (Tr. 392). On June 13, 2015, Jim Lombardo, P.A., commented that the surgery improved Sims's condition and noted her discharge. (Tr. 385). In July 2015, an x-ray performed on Sims's lumbar showed "[n]ormal postoperative" findings. (Tr. 380).

On August 5, 2015, Sims's "second set of postoperative x-rays look[ed] quite good after [the] lumbar fusion." (Tr. 266). Sims also stated that her soreness felt better and she had been more active. (*Id.*). Dr. White described Sims as doing well after the procedure. (*Id.*). On August 21, 2015, Sims returned to Dr. Crystal for her six month

check up. (Tr. 305). During the visit, Sims remarked she underwent surgery on her lumbar spine and still experienced a lot of pain. (*Id.*). In September 2015, Sim's third set of postoperative x-rays "look[ed] good," her incision healed fine, and she overall had been doing "fairly well." (Tr. 265). Dr. White gave Sims permission to stop using her back brace and to start outpatient therapy. (*Id.*). In October 2015, Dr. White labeled Sims as "doing well," acknowledged she completed physical therapy, and released her to return to work. (Tr. 264).

In March 2016, Sims visited Dr. Crystal complaining of radiating neck pain. (Tr. 307). During a general exam, Dr. Crystal observed Sims's musculoskeletal system showed normal range of movement and strength. (Tr. 308). In September 2016, Sims reported no new complaints during her six month check up with Dr. Crystal, and she stated she still took Percocet to treat her back pain. (Tr. 309). In April 2017, Sims again complained of radiating neck pain. (Tr. 311). Dr. Crystal prescribed Sims Tizanidine and Prednisone. (Tr. 312).

In June 2017, Sims returned to Dr. White complaining of severe neck pain. (Tr. 263). During a physical examination, Sims displayed a positive spurling sign. (*Id.*). However, she had no obvious motor deficits. (*Id.*). Dr. White stated Sims probably had cervical disc problems and ordered an MRI scan of her head and neck. (*Id.*). Dr. White reviewed the MRI findings and found "mild C5 through C7 spondylosis." (Tr. 261). Sims exhibited "significant cervical osteophyte at C6 that . . . caus[ed] indentation of the thecal sac." (*Id.*). She also displayed "some degeneration of the C5 disc but the

15

spurring [had] more [of an effect on] C6." (*Id.*). Dr. White stated the MRI findings could be surgically repaired, but he wanted to recommend Sims a cervical epidural first. (*Id.*). In September 2017, Dr. White reported Sims refused the epidural. (Tr. 260). He then stated Sims needed a "two level anterior C5 and C6 discectomy and fusion." (*Id.*).

On October 24, 2017, a cervical spine x-ray portrayed Sims suffered a degenerative C5 disc, but she otherwise exhibited a normal cervical spine. (Tr. 350). On October 26, 2017, Sims underwent surgery for a "[h]erniated cervical 5 and cervical 6 dis[c]." (Tr. 360). Lombardo, on October 27, 2017, noted Sims's discharge. (Tr. 365). He also stated Sims had no complication with her surgery and an improved condition upon her discharge. (*Id.*).

In November 2017, Dr. White asserted Sims's first set of postoperative cervical spine x-rays "look[ed] good" and her incision healed well. (Tr. 345). Sims also portrayed minimal difficulties at that point. (*Id.*). Dr. Whited told Sims that she could go out but not to overdo it. (*Id.*). He further commented that Sims no longer needed muscle relaxers. (*Id.*). On December 4, 2017, Dr. Crystal noted Sims's exhibited a normal range of movement and strength in her musculoskeletal system. (Tr. 313–14). On December 6, 2017, Sims's "second sent of postoperative x-rays look[ed] good after [the] anterior cervical discectomy and fusion." (Tr. 343). Dr. White noted Sims's incision healed fine and she had been doing well. (*Id.*). He released Sims to return to work as needed. (*Id.*).

On May 22, 2018, Sims presented at her first pain management visit at Cherokee

16

Health Clinic for neck and low back pain. (Tr. 395). The Clinic noted Sims did not use an assistive walking device. (Tr. 399). During a physical exam, Sims experienced pain when demonstrating the range of motion in her arms, shoulder, and lower back. (Tr. 399). She did, however, portray maximum strength in her upper and lower extremities. (Tr.399–400). Sims also did not suffer a gait or walking balance disturbance. (Tr. 400). The Clinic diagnosed Sims with Cervicalgia and Lumbago. (Tr. 401). On May 29, 2018, the Clinic began prescribing Sims Percocet. (Tr. 415). In multiple pain management visits, Sims rated her medication as being 25-50% effective, sometimes more. (Tr. 416, 418, 420, 423–26, 428).

In June 2018, Dr. Crystal reported Sims exhibit normal range of motion and strength when examining her musculoskeletal system. (Tr. 445–46). In December 2018, Dr. Crystal again reported Sims's musculoskeletal system as displaying normal range of motion and strength. (Tr. 447–48). In January 2019, a nerve conduction study of Sims's upper extremities revealed findings consistent with mild bilateral carpal tunnel syndrome. (Tr. 430). In February 2019, a nerve conduction study of Sim's lower extremities showed no evidence of "compression neuropathies of the peroneal or tibial nerves distally" or "peripheral neuropathy." (Tr. 437). The study also stated that "[r]educed sensory amplitude findings may be contributed to technical error." (*Id.*).

The record portrays Sims underwent surgery for degenerative disc disease in her lumbar and cervical spine. After both surgeries, medical records reported Sims displayed an improved condition and normal postoperative findings. Sims then

17

received a back brace, physical therapy, pain medication, and muscle relaxants to conservatively treat her lingering pain. She did not, however, receive a prescription for a walking assistance device, or a recommendation for additional physical therapy or surgery. The record then portrays Dr. White released Sims to return to work as needed after her neck surgery, and Dr. Crystal reported Sims's musculoskeletal system exhibited a normal range of motion and strength in two subsequent visits. The Cherokee Health clinic also noted Sims had maximum strength in her lower extremities. And although Sims suffers mild carpel tunnel syndrome, the medical records show she manifests no sensory or motor deficits and has maximum strength in her hand grip and upper extremities.

In sum, substantial evidence supports the ALJ's assessment of Sims's pain limitations and RFC. Although Sims maintains her pain limits her to a greater degree than what the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel*, 631 F.3d at 1178 (citations omitted). Thus, the ALJ did not err in assessing Sims's pain allegations or RFC.

Lastly, Sims argues that Grid Rule 201.14 should apply to her because she turned 50 years old on January 16, 2019, less than one month after her date last insured. "Grid Rule 201.14 directs a finding of disability where a claimant is closely approaching advanced age (i.e., 50-54 years old), has at least a high school education and skilled or semi-skilled work experience that is not transferrable, and is limited to sedentary work." *Smith v. Soc. Sec. Admin., Comm'r*, No. 4:17-CV-01386-SGC, 2019 WL 1281199, at *8

18

(N.D. Ala. Mar. 20, 2019) (citing 20 C.F.R. Part 404, Subpart P, App. 2, § 201.14). Because substantial evidence supports the ALJ's decision that Sims could perform light work with certain limitations, Grid Rule 201.14 does not apply to Sims.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**DONE** and **ORDERED** this 23rd day of March, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE